E-FILED
Monday, 27 March, 2023  01:17:37 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| KENNETH SEIDLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 20-4258 |
| | ) | |
| LIBERTY HEALTHCARE CORP., | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | | |

## **SUMMARY JUDGMENT ORDER**

Plaintiff, proceeding pro se and presently civilly detained at
Rushville Treatment and Detention Center, brought the present
lawsuit pursuant to 42 U.S.C. § 1983 alleging Fourteenth
Amendment claims for the denial of mental health treatment and
exposure to a greater risk of contracting the Covid-19 virus. The
matter comes before this Court for ruling on Defendants' Motions
for Summary Judgment (#40), (#47). Defendants' motions are
granted.

A. Plaintiff's Failure to Respond

Defendants Perez and Scott filed their Motion for Summary
Judgment (#40) on March 4, 2022. Plaintiff's response was due

March 25, 2022. Plaintiff never responded. Defendants Jumper and Liberty Healthcare Corporation filed their Motion for Summary Judgment (#47) on July 8, 2022. On July 26, 2022, Plaintiff requested additional time to respond. Motion (#49). The Court allowed that motion and extended Plaintiff's response deadline to August 29, 2022. Plaintiff has not filed a response.

Pursuant to Local Rule 7.1(D)(2), Plaintiff's failure to respond is deemed an admission of Defendants' summary judgment motions. However, admission of Defendants' motions does not automatically result in judgment for Defendants. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). Defendants must still demonstrate entitlement to judgment as a matter of law. *Id.* Although Plaintiff has not provided his own version of the facts and has not disputed Defendants' facts, the Court must still view all the undisputed facts in the light most favorable to the nonmoving party, and the Court must draw all reasonable inferences in the nonmoving party's favor. *Adams v. Wal–Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003); *Curran v. Kwon*, 153 F.3d 481, 485–86 (7th Cir. 1998).

B. <u>Facts</u>

These facts are set forth for purposes of this Order only. Defendant's proposed facts are accepted where supported by cites to evidence. Plaintiff has not disputed any of Defendant's facts.

Plaintiff has been civilly detained at Rushville Treatment and Detention Facility (TDF) since 2006 pursuant to the Illinois Sexually Violent Persons Commitment Act (SVP Act), 725 Ill. Comp. Stat. § 207/1 *et seq.* The SVP Act defines "sexually violent person" as "a person who has been convicted of a sexually violent offense … and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 Ill. Comp. Stat. § 207/5(f). Commitment lasts until such time that the individual is no longer a sexually violent person as determined by the state court that issued the commitment order. *Id.* § 207/40(a).

The TDF is a secure, locked facility. Residents may not leave unless escorted by guards for some legal or medical purpose. Most residents have a roommate and live in units that allow for somewhere between 36 and 48 residents to gather in a day room on a regular basis, as well as in the yard in close proximity.

Defendant Liberty Healthcare Services provides mental health treatment services to TDF residents for purposes of addressing the mental health conditions that predicate the residents' confinement. The treatment program is voluntary, and the core program (also referred to as sex-offender specific therapy) has five stages. The program also includes ancillary groups designed to address barriers identified during core treatment. *Id.* Residents who consent to treatment are placed on treatment teams and assigned to a primary therapist. *Id.*

In March 2020, a novel coronavirus, Covid-19, emerged. Covid-19 continues to exist in some variant of the original novel virus.

Defendant Gregg Scott was the Facility Director of the TDF during the beginning of the Covid-19 pandemic in March 2020. Scott left the TDF and ceased being Facility Director on June 16, 2020.

Scott received recommendations and guidelines from numerous governmental entities on how to safely run the TDF. Scott, while he was the director of the TDF, issued numerous memoranda outlining precautions the TDF would be taking to

protect residents and staff from the Covid-19 virus. Specifically, Scott received orders from the Governor's Office to place the facility on lockdown to prevent the spread of Covid-19 and to ensure the safety and security of TDF staff and residents. Scott also received guidance from the Illinois Department of Public Health and the CDC regarding social distancing and the use of PPE within the TDF. All the changes in group therapies, including limitations on the number of individuals allowed in groups, what PPE should be worn, and the cancellation of certain groups, were made pursuant to these recommendations and guidelines.

Since the beginning of the pandemic, treatment has been offered and provided to residents of the TDF in a restricted and limited fashion. Part of the time, residents were restricted to small groups of five or ten individuals. At times, the entire facility was shut down due to Covid-19 spikes. Individuals who tested positive were quarantined, and often entire housing units were quarantined to avoid spread of the virus. At times, clinical staff were directed not to meet in groups, but were directed to assist with providing meals and other necessary services to residents of the TDF. During most times when group treatment was not available, individual treatment

was available. Residents were usually able to meet with their primary therapist to discuss particular problems.

The TDF does not have iPads or tablets to distribute to each resident. The TDF does not have the technological capabilities to conduct group therapy through the facility television. Group sessions are designed to promote interaction and feedback between residents and TDF mental health staff.

Defendant Javier Perez was employed at the TDF as a STA II during all times relevant to Plaintiff's complaint. Perez is not a mental health professional. As part of his duties, Perez supervised STA I security personnel at the TDF. Perez is unaware of any member of TDF staff refusing to wear PPE while at the TDF. Perez did not make any decisions regarding the TDF's response to the Covid-19 pandemic.

Plaintiff has been tested for Covid-19 since the pandemic began in March 2020. Plaintiff has never received a positive test result and has never contracted Covid-19.

Defendant Dr. Jumper is the Facility Clinical Director at the TDF. Dr. Jumper is an employee of Defendant Liberty Healthcare Corporation. As the Facility Clinical Director, Dr. Jumper oversees

the clinical treatment provided to the residents at the TDF. In Dr. Jumper's role as clinical director, he is not assigned to a treatment team. In general, Dr. Jumper does not provide direct patient care to residents at the facility. However, he may fill in when needed or observe others when he feels it necessary or appropriate.

Dr. Jumper testified that Plaintiff's clinical records at the TDF are kept in the ordinary course of business by clinicians at the facility. Clinicians rely upon these records when providing treatment to Plaintiff. Residents at the facility are provided psychological services and group treatment. These services have the goal of reducing, eliminating, or both, the likelihood that such person would engage in sexual violence in the future. The recommended services and treatment are documented in a Master Treatment Plan which is maintained in the resident's file. The plan is developed by one or more of Dr. Jumper's team members. The team members as a group make decisions regarding appropriate groups for the residents on their team.

Dr. Jumper was not personally involved in determining which group or groups Plaintiff should be assigned to while at the facility.

When the facility director issued directives limiting group size, clinical staff adhered to those directives. Dr. Jumper found the directives issued by the facility director to be consistent with directives staff were receiving or were made aware of from the Governor as executive orders. Dr. Jumper does not believe that restrictions were imposed for any purpose other than protecting residents and staff from Covid-19 infection.

Although unable to meet in groups in the same way they had before March 2020, residents were able to progress in treatment as it was offered. Some residents continue to participate in written assignments and may progress through their treatment without the same group requirements as before the pandemic. While not all groups can be facilitated in this manner, to the extent they can, this has been encouraged. Modifications to the pre-pandemic treatment model has been difficult because certain sex offender groups require interaction among group members as well as the facilitator. Limitations by the Facility Director have made it difficult for both clinicians and residents. Dr. Jumper has reached out to both the facility director and Liberty Healthcare administrators to discuss treatment alternatives. Most of these options require treatment by

video. All such funding must come from DHS. Dr. Jumper cannot authorize funding for technology that does not already exist in the facility, nor does any Liberty Healthcare employee have such authority. Dr. Jumper and Liberty cannot make security decisions regarding technology.

Residents have been given some discretion as to whether they wish to appear in a group setting and potentially expose themselves to the virus. Any failure to attend has not been held against a resident due to missing classes during the pandemic. Dr. Jumper is not aware of any information that would suggest that Plaintiff's SVP status or recommendation would be any different currently if he had been able to meet more often or in larger groups.

To the extent persons have been recommended for conditional release, they were allowed to continue with those plans even if they were unable to complete all the necessary preparation work that normally would have gone into such a move.

Initially, the administration did not make plans to facilitate nonstandard treatment modes because the administration believed the pandemic would end. As the virus has maintained its presence, the administration has adapted to allow more movement and

congregation during times Covid-19 numbers are low or non-existent.

All staff and residents are encouraged to engage in safety practices and keep away from others as needed. These practices are mandated by the Illinois Department of Human Services administration. Dr. Jumper is not employed by DHS and has no direct control over any DHS employee. Dr. Jumper cannot enforce PPE mandates against DHS staff. Dr. Jumper would remind Liberty employees to follow these guidelines if he saw that an employee was not doing so.

All persons who work within the TDF are required to be vaccinated to enter the building. Those with medical or religious exemptions are tested twice weekly for Covid-19.

To be released from the TDF there must be a court order. Persons held in the TDF are given the option of publicly appointed counsel if they cannot afford an attorney. Plaintiff or his attorney must seek release through the process established in the Sexually Violent Person statute.

Residents at the TDF are examined by an evaluator outside the facility, typically on a yearly basis. 725 Ill. Comp. Stat. 207/55.

Plaintiff's re-examination for 2020 occurred in October 2020, with a report being generated on October 9, 2020. The evaluator was Stephen Gaskill, who documented that Plaintiff declined to be interviewed. The evaluator noted Plaintiff indicated he wanted to participate in treatment groups in 2013. He began treatment foundations at that time but declined ancillary groups. The evaluator noted Plaintiff participated in treatment foundations in 2014. By the end of 2014, Plaintiff was not attending any treatment groups. He was considered a non-treatment resident, and he was still reviewed yearly.

Plaintiff joined decision-making model in October 2019. Plaintiff began anger management group in January 2020. He continued his participation in treatment foundations. Groups were then suspended in March 2020. Plaintiff was placed in disclosure group at the end of April 2020, but the group did not start until June 2020 due to Covid-19. He began attending disclosure group on July 21, 2020. The evaluator completed his report and recommended Plaintiff continue to be found as an SVP under the SVP Commitment Act. The evaluator noted that Plaintiff has had limited exposure to sex offender treatment and only recently agreed

to participate in sex offender treatment despite his lengthy commitment.

Plaintiff was evaluated by Dr. Stephen Gaskill the year before, in October 2019. Gaskill came to the same conclusion in 2019.

Plaintiff completed his entry to treatment evaluation, and a report was issued on September 21, 2020. This document helps the treatment team determine the type of treatment appropriate for Plaintiff. A Master Treatment Plan was developed for Plaintiff on March 10, 2021, signed by Plaintiff and his team. A prior treatment plan had been developed for him on January 9, 2020. Plaintiff's goals included attending treatment foundations and ancillary groups.

A subsequent treatment plan was developed on June 9, 2020. This plan documented that Plaintiff started in treatment foundations again on June 19, 2019, after a 5 year pause in treatment. He was moved to Disclosure group on April 28, 2020. Plaintiff's records reflect that in recent times until 2019, he did not participate in treatment and continued to refuse treatment until June 13, 2019. Plaintiff had a primary contact with a clinical therapist on April 23, 2021. Plaintiff participated in treatment

foundations group beginning in June of 2019. In October of 2019, it appears that Plaintiff was also in decision-making model group. Plaintiff continued to have primary contacts with Ms. Goddard in October of 2019. Ms. Goddard and Ms. Price also facilitated decision-making model group through November of 2019. Plaintiff was in decision-making model group in December of 2019. Plaintiff was participating in anger management in February of 2020. Plaintiff participated in treatment foundations in March of 2020 until group restrictions were placed on the groups.

During the time of the restrictions, Plaintiff had a primary contact with therapist Goddard on April 29, 2020. Ms. Goddard encouraged Plaintiff to begin working on his comprehensive timeline so when groups started back up, he would be able to start presenting it to the group. Plaintiff had primary contacts with Ms. Goddard in May of 2020 on May 6, May 13, and May 27. Ms. Goddard met with Plaintiff in a group room to talk about a book that he had read. Ms. Goddard gave Plaintiff a copy of the autobiography outline and encouraged him again to begin working on this so that when groups resumed, he would be ahead of the game. He agreed that this would be a good idea.

On May 27, 2020, Ms. Goddard attempted to meet with Plaintiff for a primary contact but was told that he refused. Plaintiff met with Ms. Goddard again in June of 2020 for primary contacts on June 1, June 9, June 15, and June 24. Ms. Goddard documented on June 9, 2020, that Plaintiff reported that he had not started on his autobiography because he was worried he wouldn't be able to remember back that far. Ms. Goddard encouraged him to follow the outline and to let it be a guide.

On June 23, 2020, Plaintiff agreed to begin his entry to treatment evaluation and signed the necessary consent forms. Plaintiff began Disclosure group in July of 2020. Plaintiff was present for all groups during July of 2020. Plaintiff began autobiography group on July 20, 2020. Entries were made on July 27, August 3, and August 10 with respect to this group.

Plaintiff participated in Disclosure when it was available in August of 2020. Plaintiff presented for group in August of 2020 on four occasions for autobiography. Plaintiff continued with Disclosure treatment throughout 2020 and 2021 as documented in his records. Plaintiff attempted to participate in December of 2020, however, groups were cancelled due to quarantine. Of the five

occasions autobiography group could have met in November of 2020, Plaintiff failed to attend on November 2 and November 9, and the three later groups were cancelled due to COVID restrictions.

Plaintiff attended Disclosure group throughout 2020 when groups were available. The records document that Plaintiff appeared on most occasions for group. There were occasions that group was cancelled for COVID. However, for the most part, groups resumed per the TDF Pandemic Treatment Activity report.

Plaintiff had years of opportunity to attend group treatment during his commitment to the TDF since 2009. Plaintiff waited 10 years before he became serious about attending sex offender treatment. Dr. Jumper is aware of no information that would suggest that Plaintiff or anyone like him would not have been recommended for release for reasons dependent on his completion of treatment after just a few months as Plaintiff appears to have missed Disclosure group for a few months in 2020 due to Covid-19.

C. Summary Judgment Analysis

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. Proc. 56(a). Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.

1. *Inadequate Mental Health Treatment Claim*

The Fourteenth Amendment requires that the conditions and duration of a detainee's confinement bear some reasonable relationship to the reasons for same. *Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003). TDF officials must therefore provide "some treatment" related to Plaintiff's underlying mental health conditions, the nature of which is left to the discretion of qualified mental health professionals. *Id.* at 1081. To prevail on a claim that he did not receive adequate mental health treatment, Plaintiff must show that an official's deliberate or reckless conduct was objectively unreasonable. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352-53 (7th Cir. 2018).

The objective reasonableness inquiry "requires courts to focus on the totality of the facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 888 (7th Cir. 2018). Liability attaches only where the official "acted purposefully, knowingly, or perhaps even recklessly" when taking the actions at issue—negligence, or even gross negligence, will not suffice. *Miranda*, 900 F.3d at 352-53. Treatment decisions made by qualified professionals are "presumptively valid" and entitled to deference unless the evidence shows that the decision constituted "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citing *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).

The restrictions TDF officials imposed to mitigate the spread of Covid-19 required Defendants Jumper and Liberty to develop ways to offer continued treatment without knowing how long the

restrictions would be in place or whether options they had employed in the past would be available in the then-foreseeable future. The Defendants concluded that the best way to do that was to offer Plaintiff and other TDF residents opportunities for individual sessions with their assigned therapists, to offer group sessions to the extent possible, and to not penalize residents who opted out of treatment over safety concerns. They apparently concluded that other treatment alternatives were not appropriate or feasible under the circumstances.

The record discloses that Plaintiff declined treatment for over ten years and began treatment shortly before the beginning of the Covid-19 pandemic. He has not presented evidence that the lack of the options during the pandemic, or otherwise, significantly hindered his progression through treatment, and his desire for different treatment or disagreement with the decisions these defendants made is not sufficient to establish a constitutional violation. *Williams v. Ortiz*, 937 F.3d 936, 944 (7th Cir. 2019).

To the extent that Plaintiff argues that the restrictions Defendant Scott imposed denied access to mental health treatment, Defendant Scott cannot be held liable for any decisions made after

he left his employment in June 2020. Defendants Scott and Perez, as non-medical personnel, were also entitled to defer to the judgment of Defendant Jumper and clinical staff regarding the best ways to provide treatment. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The memos Defendant Jumper authored in response to the evolving restrictions in place permit only the inference that clinical staff was engaged in ongoing efforts to provide treatment.

The Court finds that no reasonable juror could conclude that Defendants' actions were objectively unreasonable. Because there is no underlying constitutional violation, Plaintiff's claims against Defendant Liberty also fail. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

2. *Inhumane Conditions of Confinement Claim*

Plaintiff alleges that Defendants Jumper, Scott, and Perez failed to take adequate steps to protect him from the risk of contracting the Covid-19 virus. Detainee claims alleging inhumane conditions of confinement arise under the Fourteenth Amendment's due process clause. *Hardeman v. Curran*, 933 F.3d 816, 821-22

(7th Cir. 2019). To prevail, a plaintiff must show that (1) the conditions were objectively serious and (2) that the official deliberately or recklessly responded in a way that was objectively unreasonable. *Id.* at 827 (Sykes, J., concurring); *Williams v. Ortiz*, 937 F.3d 936, 942-943 (7th Cir. 2019). Courts must afford deference to officials' decisions regarding the best ways to achieve legitimate penological goals. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

At the onset of the Covid-19 pandemic, Defendant Scott implemented restrictions recommended by public health officials to mitigate the spread of Covid-19, including restrictions on movement throughout the facility, limitations on the number of people that could meet in a group setting, PPE requirements, and quarantines. Defendant Scott and his successor continuously modified these restrictions in response to the available data. Defendant Jumper was unable to remedy any noncompliance by DHS staff. Jumper instructed clinical staff to wear appropriate PPE in the facility, and he took steps to remedy any noncompliance he observed. The record does not permit a reasonable inference that Defendant Perez

failed to wear appropriate PPE at any time he interacted with Plaintiff. Plaintiff never tested positive for the virus.

The record does not permit a reasonable inference that Defendants' actions were objectively unreasonable under the circumstances. The Court finds that no reasonable juror could conclude that Defendants violated Plaintiff's constitutional rights.

**IT IS THEREFORE ORDERED:**

1) **Defendants' Motions for Summary Judgment [40][47] are GRANTED. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions not addressed below are denied as moot, and this case is terminated.**

2) **If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues Plaintiff wishes to present on appeal, to assist the Court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *see also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose...has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.**

Entered this 27th day of March, 2023.


                          *s/Sue E. Myerscough*
                    _____
                         SUE E. MYERSCOUGH
                         U.S. DISTRICT JUDGE